**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL T. TODD, | ) | CASE NO. 1:11-cv-1099 |
| | ) | |
| Plaintiff, | ) | JUDGE NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

Plaintiff, Michael T. Todd ("Plaintiff"), challenges the final decision of Defendant,

Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying his

applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act,

42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("the Act").  This Court has jurisdiction pursuant

to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends

that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

In June 2002, Plaintiff applied for a POD, DIB, and SSI and alleged a disability

onset date of July 31, 2000.  (Tr. 115-20, 327-33.)  His applications were denied initially and upon reconsideration (Tr. 52-53, 334, 339), so he requested a hearing before an administrative law judge ("ALJ") (Tr. 65).  On April 28, 2005, the ALJ found Plaintiff not disabled.  (Tr. 355.)  On July 18, 2005, the Appeals Council remanded Plaintiff's claims for further proceedings regarding Plaintiff's mental impairments.  (Tr. 356-59.)

On November 8, 2005, the ALJ held Plaintiff's hearing upon remand from the Appeals Council.  (Tr. 527, 1154- 1201.)  On February 22, 2006, the ALJ again found Plaintiff not disabled.  (Tr. 540.)  On June 2, 2006, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 550.)  On July 18, 2006, Plaintiff filed a complaint in federal court to challenge the Commissioner's final decision.  *Todd v. Comm'r of Soc. Sec.*, No. 1:06-cv-1740 (N.D. Ohio), Docket Entry No. 1.  On February 15, 2008, the district court reversed the Commissioner's final decision and remanded the case for further proceedings before the Social Security Administration to obtain additional evidence on the effects of drugs and alcohol on Plaintiff's impairments.  (Tr. 541-44.)  On April 14, 2008, the Appeals Council remanded Plaintiff's claims pursuant to the district court's order.  (Tr. 545-47.)

On September 15, 2006, while Plaintiff's district court appeal was pending, Plaintiff filed another application for SSI and alleged a disability onset date of February 1, 2001.  (Tr. 1087-89.)  His application was denied initially and upon reconsideration, so he requested a hearing before an ALJ.  (Tr. 20.)  On November 13, 2008, the ALJ held Plaintiff's third hearing, at which point the ALJ consolidated all of Plaintiff's applications.  (Tr. 20.)  Plaintiff appeared at the hearing, was represented by counsel,

2

and testified.  (Tr. 20.)  A medical expert ("ME") and vocational expert ("VE") also appeared and testified.  (Tr. 20.)  On December 19, 2008, the ALJ rendered a partially favorable decision:

- Based on the applications for SSI filed on June 20, 2002, and September 15, 2006, Plaintiff had been disabled under the Act beginning June 10, 2008; but

- Based on the application for a POD and DIB filed on June 20, 2002, Plaintiff was not disabled under the Act through September 30, 2004, the date last insured.

(Tr. 34.)  On March 23, 2011, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 12.)  On May 27, 2011, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)

On November 28, 2011, Plaintiff filed his Brief on the Merits.  (Doc. No. 16.)  On February 13, 2012, the Commissioner filed his Brief on the Merits.  (Doc. No. 18.)  On March 5, 2012, Plaintiff filed a Reply Brief.  (Doc. No. 20.)

Plaintiff asserts two assignments of error:  (1) the ALJ failed to analyze Plaintiff's physical impairments during his step three determination of whether Plaintiff's impairments met or medically equaled any impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"); and (2) the ALJ's finding that Plaintiff was not disabled before June 10, 2008, is not supported by the VE's testimony.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was 47 years old on his alleged disability onset date, and 55 years old on the established disability onset date of June 10, 2008.  (Tr. 27, 33.)  He has at least

3

a high school education and is able to communicate in English.  (Tr. 27, 33.)  He has

past relevant work experience as a cook and kitchen helper.  (Tr. 27.)

> **B.    Medical Evidence**

Plaintiff's impairments include COPD, sleep apnea, polysubstance abuse, and

schizophrenia.  The following is a summary of Plaintiff's medical history regarding his

breathing problems, which is the only medical evidence that is relevant to the

disposition of Plaintiff's assignments of error.

On January 31, 2001, Plaintiff was treated at MetroHealth for acute bronchitis

and was prescribed Bactrium.  (Tr. 311.)  Plaintiff was advised to quit smoking.  (Tr.

311.)

On February 5, 2002, Plaintiff presented to the hospital emergency department

because of shortness of breath and non-productive cough.  (Tr. 206.)  Dr. T. J. Kinney,

M.D., attended to Plaintiff and noted that Plaintiff had a sleep disorder.  (Tr. 206.)  A

chest x-ray revealed plate-like atelectasis[1] in the right base.  (Tr. 206.)  Dr. Kinney

instructed Plaintiff to continue using a Ventolin inhaler and prescribed prednisone.  (Tr.

359.)

On March 6, 2002, Plaintiff presented to the emergency department with

complaints of snoring and a swollen uvula for the past several weeks.  (Tr. 205.)  Dr. W.

Clark, M.D., attended to Plaitniff and reported upon examination that Plaintiff suffered

only "minimal" swelling of the uvula.  (Tr. 205.)  Dr. Clark diagnosed uvular edema and

---

[1] Atelectasis is an "incomplete expansion of a lung or a portion of a lung"; or
"airlessness or collapse of a lung that has been expanded"; or an "absence of
air in a normally air-filled space."  *See Dorland's Illustrated Medical Dictionary*
171 (30th ed. 2003).

4

prescribed antibiotics and prednisone.  (Tr. 205.)

On December 30, 2002, Plaintiff underwent a polysomnogram performed by Dr. Masroor Mustafa, M.D., upon Plaintiff's complaints of snoring, nocturnal shortness of breath, and excessive daytime sleepiness.  (Tr. 196-97.)  Dr. Mustafa diagnosed Plaintiff with severe obstructive sleep apnea/hypopnea that was fairly controlled with a CPAP[2] machine at a setting of 12 centimeters of water pressure.  (Tr. 197.)

On January 21, 2003, Plaintiff presented to Dr. Franklin D. Krause, M.D., for a one-time consultative physical examination.  (Tr. 214-15.)  Dr. Krause reported that he performed pulmonary functioning studies on Plaintiff, which showed "probably fair effort at best but at most . . . a minimal obstructive, moderate restrictive ventilatory defect." (Tr. 215.)  Dr. Krause diagnosed Plaintiff with a history of sleep apnea and noted that, although Plaintiff used a nasal CPAP, there was no immediate benefit after two weeks of such therapy.  (Tr. 215.)  Dr. Krause also diagnosed Plaintiff with a "[s]omewhat long and minimally edematous uvula" and a "[h]istory of substance abuse allegedly quiescent."  (Tr. 215.)

On February 11, 2003, Plaintiff presented to Dr. Raed Khairy, M.D., to establish a new treatment relationship.  (Tr. 303.)  Dr. Khairy diagnosed Plaintiff with sleep apnea.  (Tr. 304.)

On March 13, 2003, Plaintiff presented to Dr. Steven M. Houser[3] for a follow-up on a sleep study.  (Tr. 299.)  Dr. Houser indicated the following.  Plaintiff had

---

[2] CPAP is an acronym that represents "continuous positive airway pressure." (*See* Tr. 320.)

[3] The record does not indicate Dr. Houser's credentials.

obstructive sleep apnea and abnormal nasal anatomy.  (Tr. 300.)  Plaintiff took Flonase

but stopped using his CPAP because he felt that "the pressure is too high."  (Tr. 299.)

Dr. Houser explained to Plaintiff that there was little hope for alleviating Plaintiff's need

for a CPAP unless Plaintiff underwent nasal surgery.  (Tr. 300.)  Dr. Houser reported

that Plaintiff indicated he would consider nasal surgery.  (Tr. 300.)

On March 18, 2003, Plaintiff presented to the MetroHealth Pulmonary Clinic to

establish a new treatment relationship.  (Tr. 297-98.)  Ms. Jan A. Steinel, C.N.P.,

attended to Plaintiff and indicated that Plaintiff reported having difficulty tolerating his

CPAP and did not use the Flonase he was prescribed because he did not like the taste

and the burning sensation it caused.  (Tr. 298.)  Ms. Steinel further indicated that she

discussed treatment options with Plaintiff; instructed Plaintiff to "push the ramping

feature button on the [CPAP] machine" if he awoke during the night; and offered

Plaintiff a "nasal pillow trial."  (Tr. 298.)  Plaintiff declined the nasal pillow trial "because

of cost."  (Tr. 298.)  Ms. Steinel switched Plaintiff to Nasonex.  (Tr. 298.)

On May 20, 2003, Plaintiff presented to Dr. Khairy for a follow-up.  (Tr. 285-86.)

Dr. Khairy indicated that Plaintiff continued to have difficulty tolerating the CPAP and

would remove the CPAP mask while asleep.  (Tr. 286.)

On July 22, 2003, state agency reviewing physician Paul S. Morton, M.D.,

performed a physical residual functional capacity ("RFC") assessment of Plaintiff and

indicated the following.  (Tr. 224-29.)  Plaintiff's primary diagnosis was Chronic

Obstructive Pulmonary Disease ("COPD") and his secondary diagnoses included sleep

apnea.  (Tr. 224.)  Plaintiff responded to treatment with his CPAP machine, but he had

difficulty keeping "it" on at night.  (Tr. 225.)  Plaintiff reported suffering dyspnea after

6

walking one block or up one flight of steps.  (Tr. 226.)  However, his impairments did not

meet or medically equal any impairments in the Listings.  (Tr. 226.)  He could lift and

carry 20 pounds occasionally and 10 pounds frequently; and sit, stand, and walk for

about 6 hours in an 8-hour workday with normal breaks.  (Tr. 225.)  His abilities to push

and pull were not limited except to the extent that he was limited in his abilities to lift

and carry.  (Tr. 225.)  He could occasionally climb ramps and stairs and never climb

ladders, ropes, or scaffolds.  (Tr. 226.)  He could frequently  balance, stoop, kneel,

crouch, and crawl.  (Tr. 226.)  He had no manipulative, visual, or communicative

limitations.  (Tr. 226-27.)  He should avoid even moderate exposure to fumes, odors,

dust, gases, and poor ventilation in the workplace.  (Tr. 227.)

On March 31, 2004, Plaintiff presented to Ms. Steinel at the pulmonary clinic for

a follow-up.  (Tr. 261-63.)  Ms. Steinel indicated the following.  (Tr. 261.)  Plaintiff

reported his sleep was not consistently refreshing; and that he continued to attempt to

use his CPAP but removed it during the night because he felt as if something were

stuck in his throat and his throat felt dry.  (Tr. 261.)  Ms. Steinel subjected Plaintiff to an

exercise oximetry study and reported that, upon walking 792 feet at a normal pace (for

approximately 6 minutes), Plaintiff's oxygen saturation remained at or above 96%.  (Tr.

263.)  Ms. Steinel assessed Plaintiff with possible mild intermittent asthma, chronic

rhinitis, and partial compliance with his CPAP.  (Tr. 263.)  She indicated that she

cancelled a pulmonary appointment and that "urgent issues [were] taken care of"; and

she recommended that Plaintiff continue using his CPAP at 12 centimeters of water

pressure, use Flonase nasal spray, lose weight and exercise daily, "increase humidifier

heat," and use an albuterol inhaler.  (Tr. 263.)

7

On February 23, 2005, Plaintiff underwent a pulmonary function study with Dr. John C. Baron and Dr. Kathrin Nicolacakis.[4]  (Tr. 246.)  The doctors indicated that there was '[e]ssentially normal spirometry" and that "[t]here has been an improvement compared to previous pulmonary function testing."  (Tr. 246.)

On April 1, 2005, Dr. Khairy authored a medical source statement regarding sleeping disorders and indicated the following.  (Tr. 320-21.)  Plaintiff suffered severe obstructive sleep apnea with mild to moderate daytime somnolence, and treatment of Plaintiff's condition consisted of the use of a CPAP machine.  (Tr. 320-21.)  Dr. Khairy further indicated that he was not able to assess whether Plaintiff's daytime somnolence was severe enough to prevent Plaintiff from performing work; but that Plaintiff was not a malingerer and Plaintiff's condition could be expected to produce "good days" and "bad days."  (Tr. 321.)  Dr. Khairy did not check any boxes regarding how often Plaintiff could be expected to be absent from work as a result of his condition and treatment, as it was "difficult to assess."[5]  (Tr. 321.)

On September 23, 2005, Plaintiff presented to the pulmonary clinic for a follow-up.  (Tr. 934.)  Ms. Steinel indicated that Plaintiff continued to smoke half a pack of cigarettes a day.  (Tr. Tr. 934.)

On November 13, 2006, state agency physician Kathryn Drew, M.D., reviewed

---

[4] The record does not clearly indicate the doctors' credentials.

[5] In an undated medical source statement, Dr. Khairy indicated that Plaintiff was unemployable.  (Tr. 239.)  Although Dr. Khairy indicated that Plaintiff was no more than moderately limited in his ability to perform physical activities, he noted that Plaintiff "can fall asleep during the daytime due to his severe obstructive sleep apnea."  (Tr. 239.)  Dr. Khairy further indicated that Plaintiff's limitations could be expected to last for 12 months or more.  (Tr. 239.)

8

Plaintiff's applications for disability benefits in relation to sleep-related breathing disorders and found Plaintiff not disabled.  (Tr. 1090.)  Dr. Drew authored a physical RFC assessment and adopted the RFC determined by an ALJ on February 22, 2006, pursuant to the A.R. 98-4 *Drummond* Ruling, specifically as follows.  (Tr. 657-64.) Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently; and sit, stand, and walk for about 6 hours in an 8-hour day with normal breaks.  (Tr. 658.)  His abilities to push and pull were not limited except to the extent that he was limited in his abilities to lift and carry.  (Tr. 658.)  Plaintiff had no postural, manipulative, visual, or communicative limitations.  (Tr. 659-61.)  He should avoid even moderate exposure to extreme cold, extreme hear, vibrations, fumes, odors, dusts, gases, and poor ventilation.  (Tr. 661.)

On February 25, 2007, state agency physician Leslie Green, M.D., reviewed Plaintiff's applications for disability benefits upon reconsideration and in relation to sleep-related breathing disorders and found Plaintiff not disabled.  (Tr. 1095.)

On June 25, 2007, Plaintiff underwent a pulmonary function test with Dr. David Weiner, M.D.  (Tr. 903.)  Dr. Weiner indicated that the test revealed "[v]ery mild underlying obstructive ventilatory defect probably consistent with small airways dysfunction most likely seen in the early stages of COPD in a cigarette smoker."  (Tr. 903.)

On September 19, 2007, Plaintiff underwent another polysomnogram performed by Dr. Raymond Salomone, M.D.  (Tr. 812, 904.)  Dr. Salomone reported that Plaintiff's obstructive sleep apnea was adequately controlled with the CPAP at 14 centimeters of water pressure.  (Tr. 812, 904.)

9

### C.     Hearing Testimony

#### 1.     Plaintiff's Hearing Testimony

Plaintiff testified at his November 13, 2008, hearing as follows.  Plaintiff lived with his mother.  (*See* Tr. 1218.)  He suffered sleep apnea; used a CPAP machine at night but sometimes found the mask on the floor in the morning; and felt sleepy during the day.  (*See* Tr. 1209.)  He was fired from all of his past jobs because he had been sleeping while at work.  (Tr. 1220.)  He attends English and communication classes at school but is not able to stay awake during full class periods.  (*See* Tr. 1209.)

Plaintiff had a driver's license but did not drive because he was concerned that he might fall asleep while driving.  (Tr. 1210.)  Instead, he rode the bus; however, in the past, he sometimes missed his destination bus stops because he would fall asleep. (Tr. 1211.)

Plaintiff also had asthma.  (Tr. 1211.)  Plaintiff suffered shortness of breath three or four times a week.  (Tr. 1215.)  He used an albuterol inhaler to treat his asthma, and he needed to stop moving and either stand in one place or sit to use it.  (Tr. 1215.)

Plaintiff did not know how much he could lift and carry, but he supposed he could lift and carry 25 pounds.  (Tr. 1215.)  When he went grocery shopping with is mother, he carried the grocery bags.  (*See* Tr. 1216.)  He also carried a book bag.  (*See* Tr. 1216.)

Plaintiff had no problems with walking.  (Tr. 1217.)  His asthma did not cause him any problems with walking.  (Tr. 1217.)  However, he often walked the distance of no more than one city block; and he did not walk farther because his health "isn't that

10

good" and he had "breathing problems."  (Tr. 1217-18.)

Plaintiff did not clean his house.  (Tr. 1218.)  Usually, he only took the trash outside the house and made his bed.  (Tr. 1218.)  Although he testified that he carried grocery bags when he went shopping, he subsequently testified that he did not go grocery shopping.  (Tr. 1218.)

## 2.    Medical Expert's Hearing Testimony

The ME testified at Plaintiff's November 13, 2008, hearing as follows.  Plaintiff suffered severe impairments including schizophrenia.  (Tr. 1221.)  The record since at least 2007 supported the conclusion that Plaintiff's schizophrenia met or medically equaled Listing 12.03.  (Tr. 1222, 1225-26.)  Plaintiff's drug and alcohol abuse in 2004 was material to his mental condition (Tr. 1224), but it was not possible to distinguish whether Plaintiff's substance abuse contributed to or caused his schizophrenia at that time (Tr. 1227).  "Currently," however, "apparently without the substance abuse, he is disabled from schizophrenia."  (Tr. 1227.)

## 3.    Vocational Expert's Hearing Testimony

During Plaintiff's November 13, 2008, hearing the ALJ posed the following hypothetical to the VE:

> First hypothetical is able to lift 50 pounds occasionally, 25 pounds frequently, stand/walk six out of eight, sit six out of eight, no limit on push/pull/foot pedal, no postural, manipulative, visual, or communications limitations. This person must avoid temperature extremes both heat and cold, humidity, smoke fumes.  This person can remember locations and procedures, can perform activities within a schedule, can do an ordinary routine independently, can work without distraction, can make work-related decisions, is willing to ask questions or seek assistance, can accept instructions and criticism, and is able to respond to work changes. This person can do no complex tasks, but can do simple, routine tasks.  No work involving arbitration, confrontation or

11

negotiation.

(Tr. 1230.)  The VE testified that such a person could perform Plaintiff's past relevant work as a kitchen helper.  (Tr. 1231.)  The ALJ then posed a second hypothetical:

> [L]ift carry 20 pounds occasionally, 10 pounds frequently, stand/walk six out of eight, sit six out of eight, no limit on push/pull/foot pedal. Again, no postural, manipulative, visual, or communications deficits.  The person must avoid temperature extremes both heat and cold, humidity, smoke fumes. Now, this person also cannot remember locations and procedures, cannot perform activities within a schedule, but can do an ordinary routine independently.  This person cannot work without distraction, cannot make work-related decisions, is able to ask questions and seek assistance, and is not able to respond to work changes.  This person can do no complex tasks, can only do simple, repetitive. No work involving fiduciary or fiscal responsibility. No work involving arbitration, negotiation, or confrontation and should have only minimal or superficial interactions with the public.

(Tr. 1231.)  The VE testified that such a person would be precluded from the workforce because he would not be able to sustain work.  (Tr. 1231.)

Plaintiff's counsel asked the VE whether a person who would be off task 20 percent of the time because of falling asleep during the workday would be precluded from performing any work.  (*See* Tr. 1232.)  Counsel stated that this hypothetical was based on Plaintiff's obstructive sleep apnea.  The VE responded that such a person would be precluded from sustained employment in the national economy.  (Tr. 1232.)

### III.   STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

12

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

13

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant met the insured status requirements of the Social Security Act through September 30, 2004.

2.    The claimant has not engaged in substantial gainful activity since July 31, 2000.

3.    Since the alleged onset date of disability, the claimant has had the following severe impairments: polysubstance abuse; paranoid schizophrenia; sleep apnea; and chronic obstructive pulmonary disease (COPD).

4.    Since the alleged onset date of disability, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, I find that, prior to February 22, 2006, the claimant had the residual functional capacity to perform a range of work at the medium exertional level . . . but due to substance abuse, he lacked the ability to work on a sustained, continuous basis in a competitive environment.  Specifically, he was unable to respond appropriately to supervision, coworkers, and usual work situations; deal with changes in a routine work setting; or make judgments commensurate with the function of unskilled work.

6.    Considering the substance abuse, the claimant was unable to perform any past relevant work.

. . . . .

9.    The claimant's acquired job skills did not transfer to other occupations within the residual functional capacity defined above.

10.    Considering the claimant's age, education, work experience, and residual functional capacity based on all of the impairments, including the substance abuse disorder(s), there were no jobs that exist[ed] in the national economy that the claimant can perform.

11.    If the claimant had stopped the substance use, the remaining limitations would have caused more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the

14

claimant would continue to have a severe impairment or combination of impairments.

12.   If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

13.   If the claimant stopped the substance use, the claimant would have had the residual functional capacity to perform a range of medium work for the period from July 31, 2000 through May 31, 2008. Specifically, he could lift, carry, push and pull 50 pounds occasionally and 25 pounds frequently.  He is [sic] limited to simple, repetitive tasks.  He was capable of understanding, remembering and carrying out simple instructions; responding appropriately to supervision, coworkers and usual work situations; dealing with changes in a routine work setting; and making judgments commensurate with the functions of unskilled work.

14.   After careful consideration of the entire record, I find that, beginning on June 1, 2008, the claimant has had the residual functional capacity to perform a range of light work . . . .  Specifically, he can lift, carry, push and pull 20 pounds occasionally and ten pounds frequently. His other limitations are the same as those stated in Finding #13 above.

15.   Prior to June 10, 2008, the claimant was capable of performing past relevant work as a kitchen helper.

. . . . .

18.   Transferability of job skills in not an issue because the claimant's past relevant work is unskilled.

19.   Beginning on June 10, 2008, considering the claimant's age, education, work experience, and residual functional capacity, there are not a significant number of jobs in the national economy that the claimant could perform.

20.   The claimant was not disabled prior to June 10, 2008 . . . but became disabled on that date and has continued to be disabled through the date of this decision.

21.   The claimant was not under a disability within the meaning of the Social Security Act at any time through September 30, 2004, the date

15

last insured.

22.  The claimant's substance abuse disorder(s) is not a contributing factor material to the determination of disability after  February 22, 2006.

(Tr. 23-34.)

## V.  LAW & ANALYSIS

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by

16

substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

The burden of showing that an error is harmful normally falls upon the party attacking the agency's determination. *Shinseki v. Sanders*, 556 U.S. 396, 129 S. Ct. 1696, 1706 (2009).

**B.    The ALJ's Step Three Determination**

Plaintiff contends that the ALJ erroneously failed to analyze whether Plaintiff's severe physical impairments—sleep apnea and COPD—met or medically equaled impairments in the Listings—namely Listings 3.02A[6] and 3.10.[7] For the following reasons, this assignment of error is not well taken.

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or medically equals one of the impairments in the Listings. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii)). An ALJ must compare the claimant's medical evidence with the requirements of listed impairments when

---

[6] Listing 3.02A is titled "Chronic pulmonary insufficiency" and constitutes "Chronic obstructive pulmonary disease, due to any cause, with the FEV1 equal to or less than the values specified in table I corresponding to the person's height without shoes." Listing 3.02A.

[7] Listing 3.10 is titled "sleep-related breathing disorders" and instructs such disorders to be evaluated under Listing 3.09 or 12.02. Listing 3.09 regards "cor pulmonale secondary to chronic pulmonary vascular hypertension" and may be met with "[c]linical evidence of cor pulmonale (documented according to 3.00G)" and with either "mean pulmonary artery pressure greater than 40 mm Hg or [a]rterial hypoxemia (which is evaluated under the criteria in 3.02C2)." Listing 12.02 regards "Organic Mental Disorders. Listing 3.10 also instructs that it be evaluated "under the applicable criteria in 4.02," which regards impairments of the cardiovascular system.

17

considering whether the claimant's impairment or combination of impairments is equivalent in severity to any listed impairment.  *Id.* at 415; *Hunter v. Astrue*, No. 1:09-cv-2790, 2011 WL 6440762, at *3 (N.D. Ohio Dec. 20, 2011); *May v. Astrue*, No. 4:10-cv-1533, 2011 WL 3490186, at *8-9 (N.D. Ohio June 1, 2011).  Nevertheless, it is the claimant's burden to show that he meets or medically equals an impairment in the Listings.  *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987) (per curiam).

Here, the ALJ found that Plaintiff's COPD and sleep apnea were severe impairments.  He then explained that "[n]o treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment."  (Tr. 23.) The ALJ continued that, "[i]n reaching the conclusion that the claimant does not have an impairment or combination of impairments that meet or medically equal a listed impairment, I also considered the opinion[s] of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion."  (Tr. 23.)  The ALJ thereafter analyzed Plaintiff's mental impairments in detail under Listings 12.03[8] and 12.09.[9]  He did not specifically mention or analyze Listings 3.02A or 3.10.  Plaintiff contends that "[i]t is impossible to discern the ALJ's rationale in finding that none of [Plaintiff's] physical impairments met or medically equaled a listing, either singly or in combination, and meaningful judicial review is impossible."  (Pl.'s Br. 14.)  The Court disagrees.

---

[8]  Listing 12.03 regards "Schizophrenic, Paranoid and Other Psychotic Disorders."

[9]  Listing 12.09 regards "Substance Addiction Disorders."

The regulations "do[] not state that the ALJ must articulate, at length, the analysis of the medical equivalency issue," and there is no heightened articulation standard at step three when the ALJ's findings are supported by substantial evidence. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).  Upon reviewing the ALJ's opinion, the Court concludes that the ALJ's finding that Plaintiff's COPD and sleep apnea do not meet or medically equal an impairment in the Listings is supported by substantial evidence.

The ALJ's observation that state agency physicians found Plaintiff did not meet or medially equal the Listings is supported by the record, as Dr. Drew and Dr. Green indicated on Disability Determination and Transmittal forms upon reviewing Plaintiff's applications in relation to sleep-related breathing disorders that Plaintiff was not disabled.  (*See* Tr. 1090, 1095.)  Dr. Drew's and Dr. Green's signatures on the forms constitute proof that a physician designated by the Commissioner has considered the equivalency issue.  *Curry v. Sec'y of Health & Human Servs.*, 856 F.2d 193 (Table), 1988 WL 89340, at *5 (6th Cir. Aug. 29, 1988).  In determining medical equivalence, an ALJ may consider the medical judgment furnished by one or more physicians designated by the Commissioner.  *See* 20 C.F.R. 404.1526(c); S.S.R. 86-8, 1986 WL 68636, at *4 (S.S.A.).

The ALJ also found that Plaintiff's subjective statements of the extent to which he was limited by his impairments were not fully credible; and he observed that:

- Plaintiff was prescribed a CPAP machine in June 2002;

- Pulmonary function tests in January 2003 revealed only a minimal obstructive and moderate restrictive ventilatory defect;

19

- Pulmonary function testing in February 2005 revealed significant improvement in Plaintiff's breathing, which appeared essentially normal;

- Pulmonary function testing in June 2007 revealed only a very mild underlying obstructive ventilatory defect;

- A sleep study in September 2007 revealed that Plaintiff's sleep apnea was adequately controlled with CPAP; and

- The record revealed that none of Plaintiff's many health care providers reported that Plaintiff had problems staying awake during examinations.

(Tr. 25-26, 29-30.)  Plaintiff has not taken issue with these findings.

Further, when a claimant is represented by counsel, typically it is counsel's responsibility to structure the claimant's case in a way that claims of disability are adequately explored.  *See Carrico v. Comm'r of Soc. Sec.*, No. 5:09-cv-2083, 2011 WL 646843, at *8 (N.D. Ohio Jan. 21, 2011) (citing *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir.1997)).  Although Plaintiff's counsel raised the issue of Plaintiff's sleep apnea during the November 13, 2008, hearing, counsel did not argue at that time that Plaintiff met or medically equaled Listings 3.02A or 3.10.

Plaintiff cites *Reynolds v. Commissioner of Social Security*, 424 F. App'x 411 (6th Cir. 2011), in support of his contention that this case should be remanded for the ALJ to explicitly discuss Listings 3.02A and/or 3.10.  *Reynolds*, however, is distinguishable.  In *Reynolds*, "the ALJ erred by failing to analyze [the claimant's] physical condition in relation to the Listed Impairments."  *Reynolds*, 424 F. App'x at 415.  The court explained that, "in this case, correction of such an error is not merely a formalistic matter of procedure, for it is possible that the evidence [the claimant] put forth could meet [Listing 1.04]."  *Id.* at 416.  Here, Plaintiff has not made such a

20

showing.  Indeed, Plaintiff does not argue that he meets Listings 3.02A or 3.10, but only contends that this case should be remanded so the ALJ can articulate a more through analysis at Step Three.  Courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969).  "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."  *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)).  Plaintiff has not provided an adequate basis to conclude that remand for the ALJ to more fully explain his Step Three analysis might lead to a different result.  Accordingly, this assignment of error is not well taken.

### C.    Whether the ALJ's Findings Are Supported by the VE's Testimony

The ALJ rested his determination that Plaintiff could perform his past relevant work as a kitchen helper prior to June 10, 2008, on his independent review of the record and on the VE's testimony.  (Tr. 33.)  Plaintiff contends that the colloquy between the ALJ and the VE does not support the ALJ's determination, in part because the ALJ stated Plaintiff was moderately limited in his abilities to maintain concentration, persistence, or pace but did not include speed-or pace-based restrictions in the hypothetical.  However, the colloquy and hypothetical to which Plaintiff cites and with which he takes issue are from Plaintiff's hearing held on November 8, 2005.  (*See* Pl.'s Br. 15-16, citing Tr. 1196-97.)  Matters related to that hearing were already appealed to the district court and remanded for further consideration, and Plaintiff does not explain

21

the relevance of that prior hearing to the Court's present review.

The ALJ did, however, recognize in his opinion that Plaintiff had moderate restrictions in concentration, persistence, or pace.  (Tr. 24.)  Plaintiff cites *Ealy v. Commissioner of Social Security*, 594 F.3d 504 (6th Cir. 2010), in support of the contention that, when the evidence establishes moderate restrictions in concentration, persistence, or pace, an ALJ must include speed- or pace-based limitations in his RFC determination.  *Ealy*, however, "does not require further limitations in addition to limiting a claimant to 'simple, repetitive tasks' for every individual found to have moderate difficulties in concentration, persistence, or pace."  *Jackson v. Comm'r of Soc. Sec.*, No. 1:10-cv-763, 2011 WL 4943966, at *4 (N.D. Ohio Oct. 18, 2011) (Boyko, J.); *but see Johnson v. Astrue*, No. 1:09-cv-2959, 2010 WL 5559542, at *8 (N.D. Ohio Dec. 3, 2010) (Pearson, J.) ("[T]here is a body of case law supporting the proposition that hypotheticals limiting claimants to jobs entailing no more than simple, routine, and unskilled work are not adequate to convey *moderate* limitations in ability to concentrate, persist, and keep pace."); *Renn v. Comm'r of Soc. Sec.*, 1:09-cv-319, 2010 WL 3365944, at *6 (S.D. Ohio Aug. 24, 2010) ("[T]he Commissioner simply reiterates the proposition that *Ealy* squarely rejects—that routine, simple jobs adequately account for deficits in memory, attention, concentration, and pace.").  Rather, "*Ealy* stands for a limited, fact-based[] ruling in which the claimant's particular moderate limitations required additional speed- and pace-based restrictions."[10]  Jackson, 2011 WL 4943966,

---

[10]  In *Ealy*, the record showed that the claimant had a limited ability to maintain attention over time, even when performing simple, repetitive tasks.  *Ealy*, 594 F.3d at 516.  Specifically, a state agency psychological consultant limited the claimant's ability to sustain attention to complete simple repetitive tasks to

at *4.

Here, Plaintiff has not shown, and the Court is not aware of evidence that Plaintiff suffered any speed- or pace-based restrictions related to his particular moderate limitations.  Further, the ALJ did not merely limit Plaintiff to simple, routine or repetitive tasks.  He also determined that Plaintiff was capable of understanding, remembering and carrying out simple instructions; responding appropriately to supervision, coworkers and usual work situations; dealing with changes in a routine work setting; and making judgments commensurate with the functions of unskilled work.  Plaintiff has not explained how these additional limitations do not adequately account for his moderate limitations in concentration, persistence, or pace.

The VE testified at Plaintiff's November 13, 2008, hearing that Plaintiff's past work as a kitchen helper normally constituted unskilled, medium-level work and that Plaintiff had performed it as such.  (Tr. 1229.)  The ALJ found that, prior to June 10, 2008, if Plaintiff had stopped his substance abuse he would have had the ability to perform medium work.  (Tr. 28.)  The ALJ posed such a hypothetical to the VE, and the VE testified that such a person could perform Plaintiff's past relevant work as a kitchen helper.  In short, the ALJ's finding that Plaintiff could perform his past relevant work

---

"[two-hour] segments over an eight-hour day where speed was not critical." *Id.* The ALJ, however, limited the claimant only to simple, repetitive tasks without any additional time-based limitations; therefore, the court found that the ALJ failed to capture the claimant's limitations in concentration, persistence, and pace adequately. *Id.*  Here, Plaintiff has not pointed to, and the Court is not aware of evidence that Plaintiff had a limited ability to maintain attention over time, even when performing simple, repetitive tasks.

prior to June 10, 2008, is supported by the VE's testimony.[11]  Accordingly, this

assignment of error is not well taken.

### VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  May 15, 2012

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the
Clerk of Courts within fourteen (14) days of this notice.  28 U.S.C. § 636(b)(1).
Failure to file objections within the specified time may waive the right to appeal
the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir.
1981); *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**

---

[11]  The Commissioner also points out that VE testimony is not required for a step
four finding, even though it may be relied upon to show whether a claimant
can perform his past work.  *See* 20 C.F.R. § 404.1560(b)(2); 68 Fed. Reg.
51153, 51159 (Aug. 26, 2003).  The ALJ stated that he based his
determination on his independent review of the record as well as the VE's
testimony.  Even if the VE's testimony were insufficient to support the ALJ's
determination, Plaintiff has not argued how the ALJ's independent review of
the record does not support his determination that Plaintiff could perform his
past relevant work as a kitchen helper prior to June 10, 2008.

24